**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SAMUEL GABAY, | ) |
| | ) |
| Plaintiff, | ) |
| | )　　　No. 25 C 8237 |
| v. | ) |
| | )　　　Judge Sara L. Ellis |
| LYONDELL CHEMICAL COMPANY and | ) |
| EQUISTAR CHEMICALS, LP, | ) |
| | ) |
| Defendants. | ) |

**<u>OPINION AND ORDER</u>**

After Plaintiff Samuel Gabay developed acute myeloid leukemia ("AML"), he brought

this negligence lawsuit against Defendants Lyondell Chemical Company and Equistar

Chemicals, LP for failing to provide him with proper safety equipment when he worked at

Defendants' petrochemical manufacturing plant in Morris, Illinois (the "Morris Plant").[1]  Gabay

alleges that Defendants failed to protect him from certain chemical agents and byproducts when

he worked at the Morris Plant, which caused him to develop AML.[2]  Defendants now move to

dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing

that Defendants' bankruptcy discharged Gabay's claim.  But because the Court finds that

Gabay's claim arose after Defendants' bankruptcy plan of reorganization, the Court denies

Defendants' motion to dismiss.

---

[1] Gabay initially also sued LyondellBasell Industries N.V. but later voluntarily dismissed the company. Doc. 31.

[2] When Gabay worked at the Morris Plant, Quantum Petrochemical Company ("Quantum") served as his employer.  But through a series of acquisitions, Defendants today hold all of what were once Quantum's assets, including the Morris Plant.

**BACKGROUND[3]**

I.       **Factual Background**

Defendants have operated the Morris Plant, which primarily produces plastic resins, since July 22, 1971. There, Defendants produce a range of chemical products by thermally cracking hydrocarbon feedstocks in high-temperature furnaces and then using distillation and other processing equipment to separate and refine the cracked mixture into individual products. Defendants primarily use ethane, propane, and butane as feedstocks to yield ethylene and propylene products, which they then use to produce various plastic resins. Defendants ship the plastic resins offsite for others to use when making products such as plastic bags, automobile parts, and food storage containers. This process creates thousands of gallons of hazardous waste each year, including benzene.

Medical literature has linked benzene to cancer in humans since the late 1920s, with cases of benzene-related leukemia first documented in 1928. The National Toxicology Program first listed benzene as a known human carcinogen in 1980, and the International Agency for Research on Cancer has stated that sufficient evidence existed to know the carcinogenicity of benzene since 1987. And the U.S. Department of Labor's Occupational Safety and Health Administration issued a final rule establishing an occupational benzene exposure limit in 1987. Researchers specifically linked benzene exposure to the development of AML in individuals with occupational or high-level exposures.

Defendants have received numerous citations for environmental hazards. In 2007, Defendants entered into a consent decree with the U.S. Department of Justice and the

---

[3] The Court takes the facts in the background section from Gabay's complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

Environmental Protection Agency (the "Consent Decree") to address air, water, and hazardous waste violations at multiple facilities, including the Morris Plant. Among other things, Equistar agreed to pay a civil penalty of $2.5 million and monitor and fix leaks of volatile organic compounds ("VOCs"), including benzene, from process units. In 2022, Defendants entered into an amendment to the Consent Decree that required Defendants to install a monitoring system to measure benzene levels at the Morris Plant's boundary.

Gabay worked at the Morris Plant from 1992 to 1997 as a process engineer. He primarily observed the ethylene production process, fixed equipment failures as needed, and improved processes to minimize malfunctions. During his tenure, Defendants failed to provide their employees with effective respiratory personal protective equipment.

In 2024, doctors at the University of Chicago diagnosed Gabay with AML. The doctors specifically noted that Gabay had "a significant occupational history as a chemical engineer" with reported benzene and polyethylene exposure, "both of [which] have been linked to an increased risk of hematologic malignancies, including [myelodysplastic syndrome] and AML." Doc. 1 ¶ 35. Gabay's employers before and after Defendants did not expose him to benzene or similar chemical agents.

Gabay's AML has affected his daily life and caused significant physical and mental pain and stress. He has undergone chemotherapy, he cannot work, and he cannot walk for more than twenty minutes. He also suffers from dizziness and general lethargy. And for the rest of his life, he will have to take numerous, expensive medications, attend monthly checkups, and undergo blood tests.

3

## II.    Defendants' Bankruptcy

Defendants filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on January 6, 2009 (the "Petition Date"). *See In re Lyondell Chem. Co.*, No. 09-10023, Doc. 1 (Bankr. S.D.N.Y.). The Bankruptcy Court set a June 15, 2009 deadline for filing proofs of claim (the "Bar Date"). *Id.*, Doc. 1547. Defendants provided notice of the Bar Date to potential creditors via publication in USA Today, the Wall Street Journal, the Financial Times, the Yomiuri Shimbun, the Daily Yomiuri, Dagblad de Telegraaf, and various other local newspapers. *Id.*, Doc. 7129. Gabay did not file a proof of claim.

On April 23, 2010, the Bankruptcy Court entered an order confirming the Debtors' Third Amended and Restated Joint Chapter 11 Plan of Reorganization (the "Reorganization Plan"). *Id.*, Doc. 4418. The Reorganization Plan became effective on April 30, 2010 and contains robust injunction and discharge provisions barring claims that arose prior to the Petition Date. *Id.*

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the

4

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."
*Iqbal*, 556 U.S. at 678.

## ANALYSIS

Defendants argue that Defendants' bankruptcy and Reorganization Plan discharged Gabay's negligence claim and therefore the Court must dismiss the lawsuit. Whether Defendants' bankruptcy discharged Gabay's claim depends on *when* Gabay's claim arose for purposes of bankruptcy—before or after the Petition Date. Defendants contend that his claim arose before the Petition Date, when Gabay worked at the Morris Plant between 1992 and 1997 and allegedly encountered benzene and other chemical byproducts. Gabay asserts that his claim arose after the Petition Date when he developed AML in 2024. Under Seventh Circuit precedent, the Court agrees with Gabay and finds that his claim arose post-petition.

Defendants primarily rely on out-of-circuit and nonbinding cases in their opening brief to argue that Gabay's claim arose pre-petition when Defendants allegedly exposed him to benzene, regardless of when he discovered his injury. *See* Doc. 25 at 5–6. At least one other circuit court has held that a claim arises "when an individual is exposed pre-petition to a product or other conduct giving rise to an injury," even if the injury manifests only after a defendant's reorganization. *In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010). Nonetheless, the precedent that binds this Court is less decided.

In their long string of citations, Defendants reference only one in-circuit case: a Northern District of Illinois Bankruptcy Court case from 1988. Doc. 25 at 6 (citing *In re Pettibone Corp.*, 90 B.R. 918 (Bankr. N.D. Ill. 1988)). In *Pettibone*, the court stated that for bankruptcy purposes, a claim "will be deemed to arise [at the time of the exposure], regardless of whether the injury

remains latent and does not manifest itself until after a case is commenced." *Id.* at 932. But more recent Seventh Circuit precedent suggests a different outcome.

The Seventh Circuit has formally adopted the "conduct test" to determine the date on which a claim arose for purposes of classifying it as a pre- or post-petition claim. *St. Catherine Hosp. of Ind., LLC v. Ind. Fam. & Soc. Servs. Admin.*, 800 F.3d 312, 315–16 (7th Cir. 2015). Under the conduct test, "the date of the claim is determined by the date of the conduct giving rise to the claim." *Id.* at 315. But the court excepted from this test situations "where the claimant is the victim of pre-petition tortious conduct, but does not realize he or she has been a victim until some harm manifests after the bankruptcy." *Id.* at 318. The Seventh Circuit further explained that in these situations, "a court may be less inclined to conclude that the party had a claim or contingent claim dischargeable in bankruptcy . . . because to do so would forever bar that party from raising the claim against the individual debtor, reorganized company, or its successors." *Id.* Defendants only response to the *St. Catherine* exception is to conclusively state in a footnote in their reply brief that "*St. Catherine* does not stand for the proposition that any diagnosis after the bankruptcy discharge creates a blanket exception to the discharge injunction as Plaintiff suggests." Doc. 33 at 3 n.4. But Defendants do nothing to explain why they believe that *St. Catherine* does not create an exception to the conduct rule, nor why Gabay's claims are not subject to such an exception.

Here, the conduct that gave rise to Gabay's tort claim occurred between 1992 and 1997 when he worked at the Morris Plant. But under the Seventh Circuit's exception to the conduct test, which binds this Court, Gabay did not become aware of his claim against Defendants and

6

therefore his claim did not arise until he received his AML diagnosis in 2024. *St. Catherine*, 800 F.3d at 318. Accordingly, Defendants' bankruptcy did not discharge Gabay's negligence claim.[4]

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to dismiss [24].

Dated: April 15, 2026

SARA L. ELLIS
United States District Judge

---

[4] Defendants also argue that if the Court finds that Gabay's claim arose pre-petition, then the Court should also find that Defendants provided Gabay with adequate notice of the Bar Date as a potential creditor sufficient to satisfy due process. But because the Court has concluded that Defendants' bankruptcy did not discharge Gabay's claim, the Court does not address the sufficiency of Defendants' notice.